**STERLING DRUG, INCORPORATED,
Plaintiff–Appellee–Cross–
Appellant,**

**v.**

**BAYER AG, Bayer USA Incorporated,
and Miles, Incorporated, Defendants–
Appellants–Cross–Appellees,**

**Mobay Corporation, Defendant.**

**Nos. 797, 1045, Dockets 92–7920, 92–7970.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 25, 1993.

Decided Jan. 7, 1994.

David Boies, New York City (Francis P. Barron, Robert H. Baron, Cravath, Swaine & Moore, New York City, and Willian, Brinks, Olds, Hofer, Gilson & Lione, Chicago, IL, on the brief), for defendants-appellants-cross-appellees.

Lewis A. Kaplan, New York City (Daniel J. Leffell, Beth R. Lobel, Paul, Weiss, Rifkind, Wharton & Garrison, and Louis Kunin, von Maltitz, Derenberg, Kunin, Janssen & Giordano, on the brief), for plaintiff-appellee-cross-appellant.

Hughes Hubbard & Reed, Abraham D. Sofaer, John M. Townsend, Alan G. Kashdan, Wash., D.C., filed a brief for amicus curiae Federal Republic of Germany.

Before: NEWMAN, Chief Judge, MINER, Circuit Judge, and CONNER,* District Judge.

JON O. NEWMAN, Chief Judge:

This appeal primarily concerns the permissible scope of an injunction issued to protect American trademark rights against infringement by a foreign corporation. The context of the dispute is the name and mark "Bayer" in which both an American corporation, Sterling Drug Inc. ("Sterling"), and a German corporation, Bayer AG, hold rights. The appeal is brought by Bayer AG, Bayer U.S.A. Inc., and Miles, Inc. from the July 22, 1992, judgment of the District Court for the Southern District of New York (Robert J. Ward, Judge), upholding Sterling's claims of breach of contract and trademark infringement and broadly enjoining Bayer AG from using the word "Bayer" in any advertisement or materials that are reasonably likely to be disseminated in the United States. *See Sterling Drug, Inc. v. Bayer AG*, 792 F.Supp. 1357 (S.D.N.Y.1992) (*"Sterling"*). We conclude that Sterling is entitled to prevail but that the injunction is overly broad and must be modified. We therefore affirm in part, vacate the injunction, and remand for reconsideration.

## Background

At the turn of the century, the rights to the "Bayer" name and mark in the United States were owned by Bayer AG. It lost those rights during World War I when Bayer AG's United States subsidiary, The Bayer Company, Inc., was seized by the United States Alien Property Custodian. In 1918, Sterling acquired rights to the "Bayer" name and mark by purchasing The Bayer Company from the Alien Property Custodian. That acquisition precipitated decades of controver-

* The Honorable William C. Conner of the United States District Court for the Southern District of New York, sitting by designation.

sy between Sterling and Bayer AG, marked by a series of lawsuits and agreements.

Sterling is a Delaware corporation with its principal place of business in New York. Sterling manufactures and sells prescription drugs and over-the-counter ("OTC") medicines, as well as home and personal care products. Ever since purchasing The Bayer Company, Sterling (which was itself acquired by the Eastman Kodak Company in 1988 and, since this lawsuit began, has changed its name to Sterling Winthrop, Inc.) has sold aspirin and related products in the United States under the "Bayer" trademark. Sterling's total sales in 1989 were $1.6 billion, of which $125 million was attributable to aspirin and related products using the "Bayer" trademark. Over the last five years, Sterling has spent approximately $50 million a year in promoting and advertising its "Bayer" trademark and products.

Bayer AG, founded in Germany some 125 years ago by Friedrich Bayer, is a large multinational corporation headquartered in Leverkusen, Germany, with worldwide sales in 1990 of $25.7 billion. The United States is Bayer AG's largest single market. In the United States, Bayer AG owns Miles, Inc., a pharmaceutical company, and Mobay Corporation, a chemical company. Bayer AG also owns Bayer USA Inc., a Delaware corporation, which is the subject of much of the pending controversy. Since the initiation of this lawsuit, Bayer USA and Mobay have been merged into Miles, and Bayer AG no longer uses "Bayer" as part of the name of any subsidiary in the United States.

### 1. The Agreements

In 1955, Bayer AG brought suit against Sterling in an ultimately unsuccessful effort to regain the right to use the "Bayer" mark in the United States. *See Farbenfabriken Bayer A.G. v. Sterling Drug, Inc.,* 307 F.2d 210 (3d Cir.1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963). It sued under the antitrust laws, arguing that Sterling had improperly asserted trademark rights to the "Bayer" mark as a means of suppressing competition. The Third Circuit held against Bayer AG, ruling broadly that Sterling "acquired absolute rights to the ex-clusive use of the trademarks in question by its purchase of [The Bayer Company, Inc.]" *Id.* at 212. The Court dismissed the suit, ruling that because Sterling had acted within its legal rights in using the mark, that use could not violate the antitrust laws.

Following this decision, Sterling and Bayer AG signed a contract in 1964 governing Bayer AG's use of the Bayer mark in the United States. The 1964 Agreement prohibited Bayer AG from using the Bayer name "in connection with Aspirin or other analgesics ... [or] in the course of trade in any other goods." 1964 Agreement ¶ 1, 2. The Agreement recognized an exception that allowed Bayer AG to use its full name (then "Farbenfabriken Bayer A.G.") in packaging inserts for consumer goods including pharmaceutical products. The Agreement also permitted Bayer AG to use its full name for nonpharmaceutical and non-consumer goods, as long as it did not advertise them on radio or television.

In 1970, Bayer AG and Sterling signed another agreement, this time dealing with the use of the "Bayer" name and mark in all countries other than the United States and Cuba. Under this agreement, in return for a payment of $2.8 million, Sterling recognized Bayer AG's exclusive rights in the "Bayer" name and mark everywhere except the United States, Canada, and some Caribbean nations. In Canada, the parties agreed to concurrent use of the "Bayer" name, while in some Caribbean countries, Sterling was granted exclusive rights to the "Bayer" name and mark.

In 1971, the parties modified the 1964 Agreement in response to Bayer AG's plan to drop "Farbenfabriken" from its corporate name. Sterling consented to the use of Bayer AG's new name in the United States, but under more limited circumstances than had been permitted under the 1964 Agreement.

The late 1970's and early 1980's saw a major expansion of Bayer AG's U.S. operations. Bayer AG bought out its partner in the Mobay Corporation, acquired Cutter Laboratories and Miles Laboratories, and created a U.S. holding company called "Rhinechem." Bayer AG's higher U.S. pro-

file led to further negotiations between Bayer AG and Sterling regarding the German firm's rights to use the "Bayer" name in the U.S. These negotiations culminated in a 1986 modification to the 1964 Agreement. The 1986 Agreement permitted Bayer AG to change the name of its U.S. holding company to "Bayer USA Inc." so long as this company remained "a non-operating holding company, i.e., [a company] not trading in goods." 1986 Agreement ¶ 1. Sterling expressly agreed to concurrent use of the Bayer tradename and to registration of the "Bayer" trademark by Bayer AG for use "in the course of trade in non-consumer and non-pharmaceutical goods." *Id.* ¶ 2. The 1986 Agreement provided that "[t]hese uses shall include advertising to the relevant trade in the normal course of trade." *Id.* Bayer for its part agreed not to use the mark "in communicating with the pharmaceutical industry or consumers in general through product, institutional or company-identifying advertising or promotion...." *Id.* Bayer AG paid Sterling $25 million for Sterling's concessions under the 1986 Agreement.

### 2. The Alleged Violations

Following execution of the 1986 Agreement, defendants began to make extensive use of the "Bayer" name and mark. Though Bayer AG characterizes these actions as being fully consistent with Sterling's contractual and legal rights, Sterling sees them as "more than a few innocent steps over the line." Brief for Appellee at 13.

Bayer AG began by obtaining federal registrations for the "Bayer" mark for industrial and agricultural chemicals and related products. It advertised these products in trade journals. In accordance with the 1986 Agreement, it renamed Rhinechem "Bayer USA Inc." Bayer AG expanded this subsidiary's managerial functions, employing 60 persons at Bayer USA Inc. where Rhinechem had employed none. During 1987 and 1988, Bayer USA conducted a corporate "image" campaign, placing a total of 67 advertisements in the *Wall Street Journal, Forbes, Fortune, Business Week,* and the "Business World" section of the *Sunday New York Times.* The advertisements introduced Bayer USA as the "highest-ranked new company on the Fortune 500," and described Bayer USA as a "group of progressive, dynamic, forward-looking companies like Miles Laboratories and Mobay Corporation." The advertisements observed that Bayer USA's "businesses range from chemical to health and life sciences to imaging and graphic information systems." Miles also distributed press releases that identified it as "the health-care company of Bayer USA Inc." Bayer AG sponsored at least three international medical symposia held in the United States. Bayer AG used its name freely in these symposia, including it in the literature printed for the events, and sometimes even incorporating it into the name of the symposium, as, for example, in "Bayer AG Centenary Symposium: Perspectives in Antiinfective Therapy".

Bayer USA also sponsored numerous theater, opera, concert, and dance performances in its local community of Pittsburgh. The programs for these events included advertisements describing Bayer USA as consisting of a group of companies "in the areas of chemicals, health and life sciences, and imaging and graphic information systems." Bayer USA, either directly or through Miles, donated to various charitable foundations, usually requesting the organizations to credit the philanthropy to both Miles and Bayer USA. After receiving a contribution of $500,000 from Bayer USA, the public radio station in Pittsburgh renamed its broadcast facility the "Bayer USA Broadcast Center for the Arts," and posted a large sign with this name in front. The station advised Bayer USA that this sign would "be visible each day to thousands of commuters and visitors...." *Sterling,* 792 F.Supp. at 1364. Bayer USA sponsored a "German Hour" program on a Pittsburgh public radio station, during which the "Bayer" name was spoken over the airwaves, but always with the German pronunciation—"buy-er".

Bayer AG also added the word "Bayer" to six billboards maintained by Mobay in the Detroit area, including one that periodically displayed the word "Bayer" as part of a changing electronic display for Mobay automobile body panels. Bayer USA also erect-

ed a sign at its Pittsburgh headquarters with the words "Bayer USA Inc." The sign was visible from nearby highways. Bayer USA erected another sign on a busy highway from Pittsburgh to the airport that identified Mobay with Bayer USA. Bayer USA also distributed corporate promotional merchandise such as T-shirts and golf towels imprinted with "Bayer USA Inc." or "Bayer/Mobay." Miles also ran employment notices in general interest newspapers throughout the country in which it described itself as "a Bayer USA Inc. Company."

### 3. Prior Proceedings

Sterling brought suit against Bayer AG and its U.S. subsidiaries for their use of the "Bayer" mark. Sterling alleged that the defendants violated its rights under the 1964 Agreement and the 1986 Agreement. Sterling also alleged violations by Bayer AG of sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) (1988). Finally, Sterling asserted claims under the New York common law of unfair competition and the New York Anti–Dilution Statute, N.Y.Gen.Bus.Law § 368–d (McKinney 1984). Sterling asked for injunctive relief and damages. It also sought to recover attorney's fees under section 35 of the Lanham Act, 15 U.S.C. § 1117(a) (1988).

After a twelve-day bench trial, the District Court held in favor of Sterling. On July 22, 1992, the Court granted Sterling permanent injunctive relief severely curtailing Bayer AG's use of the "Bayer" mark, but reserved trial and decision on the question of damages until after our decision in this appeal. The Court declined Sterling's request for attorney's fees. Bayer AG now brings this interlocutory appeal under 28 U.S.C. § 1292(a)(1) (1988). Sterling cross-appeals from the District Court's denial of attorney's fees.

### Discussion

Before we consider the proper scope of the injunction, we must consider Bayer AG's

claim that it did not violate Sterling's rights under either contract or trademark law.[1]

### I. Violations

### A. Contract Claims

The District Court ruled that Bayer AG had violated its obligations under the 1964 Agreement as modified by the 1986 Agreement. The 1986 Agreement provides that Bayer AG "will not use 'Bayer (USA) Inc.' in consumer advertising media or in advertising, brochures or catalogues directed to the pharmaceutical trade." 1986 Agreement ¶ 1. Applying New York law,[2] the District Court ruled that the agreements were unambiguous, and that extrinsic evidence of the parties' intent was thus inadmissible. It then found that Bayer AG had violated the 1986 Agreement's prohibition against defendants' use of the "Bayer" name and mark in "consumer advertising media."

On appeal, Bayer AG does not challenge the District Court's ruling that the contract was unambiguous. Instead, Bayer AG challenges the District Court's factual findings regarding the nature of its use of the "Bayer" name and mark. Thus, the question is not what the contract terms mean, but whether the defendants' actions violated those terms. Bayer AG argues that, contrary to Judge Ward's findings, it did not use the mark in "consumer advertising media." We review the District Court's factual findings with regard to whether a contract has been violated for clear error. Fed.R.Civ.P. 52(a).

Under the 1986 Agreement, Bayer AG agreed not to "use the trademark and tradename 'Bayer' in communicating with the pharmaceutical industry or consumers in general through product, institutional, or company-identifying advertising or promotion...." 1986 Agreement ¶ 2. We agree with Sterling that Bayer AG's extensive advertising in the programs for various cultural events that it sponsored violated its

---

1. Bayer AG also argues that it did not violate New York anti-dilution or unfair competition law. Because the inclusion of these two causes of action does not alter the scope of the relief, we do not need to consider these claims at this time.

2. While the 1986 Agreement does not itself contain a choice of law clause, it modifies the 1964 Agreement, which provides that New York law governs. 1964 Agreement ¶ 16.

agreement not to use the "Bayer" mark in "institutional or company-identifying advertising or promotion" with consumers in general. The audience for the presentation of "Oklahoma!" by the Civic Light Opera in Pittsburgh, for example, received programs with a full-page advertisement from Bayer USA featuring a bald eagle and presenting Bayer USA as "a company with businesses in chemicals, healthcare and imaging technologies." And we agree that Bayer AG also violated the ban against institutional advertising to consumers by placing advertisements in magazines such as *Fortune* and *Business Week* describing Bayer USA as "the highest-ranked new company on the Fortune 500," with businesses ranging "from chemicals to health and life sciences to imaging and graphic information systems."

### B. Lanham Act

1. *Likelihood of confusion.* The Lanham Act, 15 U.S.C. §§ 1051–1128 (1988), prohibits any use of a registered mark if the "use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (1988). Analyzing the likelihood of confusion in light of the factors enumerated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961),[3] the District Court held that Bayer AG's use of the "Bayer" mark created a likelihood of confusion, justifying an injunction against further use. Bayer AG challenges that conclusion, arguing that (1) the Court clearly erred in its findings on the various *Polaroid* factors; and (2) the Court failed to give due consideration to Bayer AG's concurrent trademark rights to the "Bayer" mark.

Before considering the District Court's findings regarding the likelihood of confusion, it is useful to identify Sterling's underlying theory of confusion. This case differs from the usual Lanham Act case, in which a senior user contends that a junior user is using the mark to sell goods based on the misperception that they originate with the senior user. Sterling's complaint is not only that consumers might believe that Bayer AG's goods actually come from Sterling, but also that defendants' use of the "Bayer" mark might confuse consumers into believing that Sterling's Bayer aspirin is actually defendants' product. Sterling also protests that Bayer AG's use of the "Bayer" mark has created confusion about the relationship between Sterling and Bayer AG. In its complaint, Sterling sets forth its theory as follows:

> Defendants' acts ... cause a likelihood of confusion ... among consumers, the general public and the pharmaceutical trade as to the affiliation of defendants and Sterling, ... and as to the origin, sponsorship, or other association of the parties' respective goods and activities.

Complaint at 11. Bayer AG contends that this theory of confusion cannot support a Lanham Act claim. According to Bayer AG, the only confusion claims cognizable under the Lanham Act are those involving a junior user that uses the senior's mark to sell its products as if they were made by the senior user.

■ Our earlier cases have rejected this cramped view of trademark law. In *Banff, Ltd. v. Federated Department Stores, Inc.*, 841 F.2d 486, 490–91 (2d Cir.1988), we allowed a claim of "reverse confusion," in which the senior user, Banff, Ltd., complained that consumers mistakenly believed that the better-known junior user, Bloomingdale's, was the source of the senior user's goods. And in *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987), we upheld a claim of confusion as to the relationship between ca-

---

**3.** In *Polaroid,* Judge Friendly articulated the following, now classic, set of factors that courts consider when determining the likelihood of confusion under the Lanham Act:

the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopt-

ing its own mark, the quality of defendant's product, and the sophistication of the buyers. *Polaroid,* 287 F.2d at 495. Originally formulated in reference to non-competing products, the *Polaroid* test has been extended to the competing products context as well. *See Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1100 (2d Cir.1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970).

ble services arising from the use of the plaintiff cable service's mark by defendant cable services. Sterling's confusion theory is thus cognizable under the Lanham Act. Allowing such confusion claims comports with the dual purposes of the Act—namely, to protect the public from confusion as to the source of goods, and at the same time to protect the trademark holder from misappropriation of its mark. *See Soltex Polymer Corp. v. Fortex Industries, Inc.*, 832 F.2d 1325, 1329 (2d Cir.1987); *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 631 (2d Cir.1980); *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co.*, 349 F.2d 389, 395 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 1198, 16 L.Ed.2d 206 (1966).

 We now turn to Judge Ward's factual findings on the *Polaroid* factors, which we review under the "clearly erroneous" standard. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2d Cir.1988). Judge Ward began his consideration of likelihood of confusion with an analysis of actual confusion. In concluding that Sterling had demonstrated such confusion, Judge Ward relied on a survey conducted by Sterling's expert which showed that three-quarters of respondents reported that the company shown in the Bayer USA headquarters sign made Bayer aspirin or aspirin in general. *Sterling*, 792 F.Supp. at 1373. Bayer AG finds numerous flaws in Sterling's survey. First, Bayer AG argues that the survey, which used shopping mall pedestrians as its subjects, focused on the wrong set of consumers—Sterling's analgesic customers rather than Bayer AG's United States customers (who consist mainly of users of industrial and chemical products). Bayer AG cites *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112 (2d Cir. 1984) and *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541 (S.D.N.Y.1991), for the proposition that the relevant market consists of the consumers of the junior user's products. Both of these cases are, however, inapposite. In both cases, the relevant mar-

ket consisted of the consumers of the junior user's products because both cases involved the traditional theory of confusion—that the junior user was selling its products as if they came from the senior user. *See Universal City Studios*, 746 F.2d at 114 (owner of "King Kong" mark sues producer of "Donkey Kong" game because purchasers of game may believe that game was made by "King Kong" mark owner); *Hutchinson*, 769 F.Supp. at 546 ("Essence" magazine seeks to prevent singer from using name "Essence" because audience may believe that magazine sponsored her). To be probative, a survey must "'have been fairly prepared and its results directed to the relevant issues.'" *Universal City Studios*, 746 F.2d at 118 (quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 657 (W.D.Wash.1982)). Where, as here, the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers.

 Bayer AG's second complaint regarding the survey is that the survey improperly suggested the answers. Sterling's survey showed the participants photographs of various signs for different companies, including defendants' companies, and then asked them "[w]hat type of product or products, if any, are made by the company or companies mentioned in the sign." Bayer AG's survey, in contrast, showed a series of photographs intended to recreate a "drive" past defendants' signs, followed by the questions: "Do you recall any thoughts that passed through your mind when you were at this location? What were they?" Without expressing any opinion as to whether one survey methodology is preferable to the other, we hold that there was no clear error in the District Court's conclusion that Sterling's "survey was fairly prepared, directed to the relevant issue, and not suggestive of any particular response." *Sterling*, 792 F.Supp. at 1373.[4] We note that

---

4. Citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), Bayer AG argues that Sterling's survey represented a mere "word association" test, and was therefore

not probative. Bayer AG's reliance on *Amstar Corp.* is somewhat odd because Bayer AG's own survey more closely resembles the survey in *Amstar Corp.* than does Sterling's survey. In both Bayer AG's survey and the defective survey in

when Bayer AG's survey asked the participants a question similar to the one posed in Sterling's survey, it achieved similar results: When asked what products were made by the company shown in the "Bayer USA" sign, 61 percent of respondents said aspirin or Bayer aspirin, while 35 percent of those shown the "Mobay—A Bayer USA Inc. Company" sign gave a similar response. *Id.*

■ Bayer AG also challenges the District Court's finding that the good faith factor did not favor either party. As evidence of its good faith, Bayer AG cites its 1986 purchase of certain rights to the "Bayer" mark, and the fact that it has never attempted to "pass off" its products as originating with Sterling. While we agree that these actions tend to support a finding of good faith, Bayer AG's other actions, including its extensive use of the "Bayer" mark in violation of Sterling's rights, point the other way. We do not think the District Court clearly erred in finding the good faith factor to be neutral in the balance of factors determining the likelihood of confusion.

■ Third, Bayer AG contends that the District Court clearly erred in finding that Bayer AG's and Sterling's products compete. Bayer AG argues that Sterling and Bayer do not use the "Bayer" mark in labeling or advertising any competing products. While it is true that Bayer AG did not use the "Bayer" mark in labeling or advertising any competing products, it did extensively seek to associate Miles, Inc., its health care division, with "Bayer U.S.A." Miles produces, among other things, over-the-counter pharmaceuticals that compete with Sterling's products. Sterling's products thus have to compete with the products of *another* company that consumers may associate with the "Bayer" mark. Even though Bayer AG did

not sell any aspirin under the "Bayer" mark in the United States, there were sufficient competitive possibilities between the two companies to support Judge Ward's finding that the proximity of products factor favored Sterling's claim of likely confusion.

Bayer AG's final complaint regarding the District Court's *Polaroid* findings is that the Court considered the wrong purchasing public in assessing purchaser sophistication. This is a reprise of Bayer AG's earlier objection that the survey focused on the wrong set of consumers. Bayer AG would have the Court consider the level of sophistication of its industrial product customers rather than Sterling's aspirin customers. This criticism fails because, as discussed earlier, it rests on a misunderstanding of the nature of the confusion alleged by Sterling. This case primarily involves reverse confusion, where consumers mistake Sterling's products as originating with Bayer AG. In such a case, the consumers relevant to the purchaser sophistication inquiry are those who purchase Sterling's products.[5]

The District Court's findings on the remaining *Polaroid* factors are unchallenged, and we consider them only briefly. First, the Court found that Sterling is unlikely to "bridge the gap" between its products and Bayer AG's products, except in the areas in which Miles and Sterling already directly compete (in which no "bridging" is necessary). The Court observed that Sterling was unlikely to move into the market for chemical and industrial products in which defendants used the "Bayer" name. Because of this fact, the Court found that the "bridging the gap" factor favored Bayer AG. Though we are somewhat uncertain about the District Court's analysis because it focused on Bayer AG's industrial and chemical products, rather

*Amstar Corp.*, the subjects were confronted with the mark and then "more or less asked if it brought anything else to mind." *Id.* In any event, we do not believe that the District Court clearly erred in finding that Sterling's survey was fair.

5. Bayer AG argues alternatively that the District Court clearly erred in finding over-the-counter pharmaceutical consumers to be unsophisticated because another District Court had found other-

wise. *See Smithkline Beckman Corp. v. Proctor & Gamble Co.*, 591 F.Supp. 1229, 1245 (N.D.N.Y. 1984), *aff'd*, 755 F.2d 914 (2d Cir.1985). We disagree. The District Court was free to find that Sterling's aspirin customers were relatively unsophisticated. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir.1992) (upholding as not clearly erroneous District Court finding that "consumers of nonprescription analgesic/sleep aids were not typically careful or sophisticated").

than its OTC pharmaceuticals, we need not reconsider this finding because, even if this factor favors Bayer AG, we would still conclude that Sterling proved a likelihood of confusion.

The District Court also found that the quality of defendants' products was high, and that this factor thus favored defendants. Countering this finding were the Court's findings that the "Bayer" mark was a strong mark, and that the degree of similarity between Sterling's mark and Bayer AG's mark was very high, such that the two marks were "virtually identical." *Sterling*, 792 F.Supp. at 1374.

■■■■ Having found that the District Court's *Polaroid* findings were not clearly erroneous, we now consider whether these findings, taken together, establish likelihood of confusion. We apply a *de novo* review standard to this legal determination. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir.1992). Considering Sterling's survey evidence of actual confusion, the strength of its mark, the fact that Bayer AG uses a mark that is "virtually identical" to Sterling's mark, and the competition between Sterling's and Bayer AG's products, we hold that Sterling has shown a likelihood of confusion arising from Bayer AG's use of the "Bayer" name and mark.

2. *Bayer AG's registrations of the "Bayer" mark.* Bayer AG argues that regardless of any confusion arising from its use of the "Bayer" mark, it did not violate Sterling's trademark rights because it held rights to "concurrent use" of the mark. Brief for Appellants at 8. As part of the 1986 Agreement, Bayer AG had purchased the rights to use the mark for non-consumer, non-pharmaceutical products. Bayer AG accordingly sought and obtained registrations, two on the principal register and one on the supplemental register, from the Patent and Trademark Office ("PTO") for the "Bayer" mark for use on industrial and chemical products. The PTO had initially rejected one of Bayer AG's applications because Sterling owned prior registrations of the mark (dating back to the pre-World War I days when The Bayer Company was still held by the German corporation) for use with such products. The PTO

relented when Bayer AG pointed out that Sterling had voluntarily cancelled its registrations for such uses in January 1986. Bayer AG now argues that these registrations safeguard it against Sterling's claim of trademark infringement.

■■■■ The fact that Bayer AG has obtained registration from the PTO for a trademark held by a prior user does not incontrovertibly establish its rights to the mark. If a second user's use of the mark creates a likelihood of confusion, a prior user can obtain a cancellation of the second user's registration. *See, e.g., Ford Motor Co. v. Ford,* 462 F.2d 1405 (C.C.P.A.1972) (cancelling "Ford Records" registration because of likelihood of confusion with Ford Motor Company's trademark "Ford"), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 690 (1973); *Southern Enterprises, Inc. v. Burger King of Florida, Inc.,* 419 F.2d 460 (C.C.P.A. 1970) (cancelling "Whoppaburger" registration because of likelihood of confusion with Burger King's "Whopper" trademark). Even if the second user's registration has become "incontestable," 15 U.S.C. § 1065 (1988), it can still be challenged if the second user is using the mark in a manner that misrepresents the source of goods. *See* 15 U.S.C. §§ 1064(3), 1065 (1988).

■■■■ Bayer AG also contends that the District Court, in determining whether there was a likelihood of confusion, should have deferred to the PTO's ruling at the time of registration that there was no such likelihood. Bayer AG's argument overlooks our decision in *Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848 (2d Cir.1988), in which we held that the doctrine of primary jurisdiction does not require a District Court to wait for a PTO ruling on a registration application before deciding a question of trademark infringement. We ruled that

> the outcome of the PTO registration proceeding would not affect the legal standard applied in the infringement claim or the scope of the required fact-finding. *The District Court would still independently have to determine the validity and priority of the marks and the likelihood of consumer confusion* as to the source of the

goods, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d [44], 47–48 [ (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) ], with this latter issue to be resolved not by reference to a registration determination by the PTO but by application of the multi-factor balancing test set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

*Goya Foods*, 846 F.2d at 854 (emphasis added). Thus, Judge Ward did not err in conducting an "independent" examination of the legal question of whether there was a likelihood of confusion from Bayer AG's use of the mark.

■ Even were the District Court generally required to defer to the PTO's determination on the issue of likelihood of confusion, such deference would certainly not be due where, as here, the second user has used the mark in ways not contemplated or approved by the PTO. We have earlier observed that the "factual frame of reference" used in a cancellation proceeding may be different than that used in a trademark infringement proceeding. *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir.1991) (no collateral estoppel effect on trademark infringement action resulting from earlier cancellation proceeding because determination of likelihood of confusion in cancellation proceeding based on different standards and different "factual frame of reference"), *cert. denied*, —— U.S. ——, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992). When the PTO approved Bayer AG's registration applications, its findings of no likelihood of confusion were based on Bayer AG's claims regarding its intended use of the mark. The PTO accordingly granted Bayer AG registrations for certain products for "all industrial use" or for "sale to commercial users in the field of agriculture and not for sale to lawn, garden or household consumers" (registrations 1,482,868 (Apr. 5, 1988), 1,484,862 (Apr. 19, 1988), and 1,531,469 (Mar. 21, 1989)). While the PTO may have been correct that confusion would not have been likely if Bayer AG had restricted its use of the mark within these bounds, that determination does not apply where Bayer AG's use of the mark has far exceeded the scope of its registrations. *See Jim Beam*, 937 F.2d at 734. Bayer AG was entitled to no favorable presumption in this trademark infringement suit on the question of likelihood of confusion because it had obtained registrations in the United States for the "Bayer" mark for certain industrial and chemical uses.

## II. Remedy

■ Having concluded that Bayer AG did violate Sterling's contract and trademark rights, we now turn to the question of relief. With a few narrow exceptions, the District Court broadly enjoined Bayer AG and its subsidiaries from using the "Bayer" mark in the United States, or even abroad if such foreign use might make its way to the American public. Bayer AG primarily complains that the injunction's extraterritorial provisions interfere impermissibly with its rights under foreign laws. Bayer AG owns rights to the "Bayer" name and mark in its home country of Germany, as well as in over one hundred other countries. Germany, as *amicus curiae*, contends that the extraterritorial prohibitions of the injunction fail to respect its sovereign rights. Bayer AG also attacks various other provisions of the injunction on the grounds that (1) they are impermissibly vague; (2) they violate its rights under earlier agreements with Sterling; and (3) they violate its free speech rights. We review the scope of the injunction for abuse of discretion. *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1542 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

1. Extraterritorial provisions of the injunction

The District Court broadly enjoined Bayer AG or its subsidiaries from using the "Bayer" name or mark in:

> "any product, institutional or company-identifying *advertisement* or promotional materials published or reasonably likely to be disseminated in the United States" (¶ 1(g)(i));

"any *employment notice* ... published or reasonably likely to be distributed within the United States (¶ 1(g)(ii));

any *radio or television broadcast* ... or other electronic means of mass communication received through one or more stations, channels or services, or by subscribers, within the United States (¶ 1(g)(iv)); or

any *news release* ... or informational materials distributed, or reasonably likely to be distributed, within the United States, or at any press conference held, or reasonably likely to be reported on, within the United States ..." (¶ 1(g)(vi)).

(emphasis added). The Court allowed a few narrow exceptions to these prohibitions. Under the injunction, Bayer AG may use the mark in advertisements or employment notices: (1) in foreign print publications that have a U.S. circulation of 5,000 or less; and (2) in trade publications when the advertisements or employment notices refer only to non-pharmaceutical, non-consumer products or pharmaceutical intermediates or ingredients. With perhaps a nod towards corporate disclosure requirements, the District Court also allowed Bayer AG to use the mark in not more than two press releases a year "exclusively concerning extraordinary events involving Bayer AG, such as changes in corporate control." (¶ 1(g)(vi)). The Court allowed an exception for press conferences held abroad and attended primarily by foreign journalists if (1) such press conferences were not conducted in English; (2) the subject of the conference did not include "any discovery, invention, activity, event, product or service within the United States"; or (3) the conferences related exclusively to Bayer AG's worldwide activities, without any special prominence given to either health care matters or Bayer AG's activities within the United States.[6] (¶ 1(g)(vi)(B)). The Court allowed the same three exceptions for press releases as long as the releases indicated that the information was "Not for Distribution or Release in the United States." (¶ 1(g)(vi)(C)). The Court also allowed Bayer AG to use the mark in press releases exclu-

sively concerning non-pharmaceutical, non-consumer products or pharmaceutical intermediates and ingredients, as long as these releases are disseminated only to print trade publications. (¶¶ 1(g)(vi)(D), (E)). Notwithstanding these exceptions, Bayer AG contends that the "extraterritorial injunctive provisions impair the ability of one of Europe's largest corporations to conduct its everyday business in its home country and around the world.". Brief for Appellants at 15.

It is well-established that United States courts have jurisdiction to enforce the Lanham Act extraterritorially in order to prevent harm to United States commerce. The Supreme Court divined such a Congressional intent to project the Act extraterritorially in *Steele v. Bulova Watch Co., Inc.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952). In that leading case, the Court applied the Act to prevent a U.S. citizen from selling fake "Bulova" watches in Mexico on the ground that his use of the "Bulova" name diverted sales in Mexico and the United States from the American trademark holder. But courts have also recognized limits on the application of the Lanham Act beyond our borders. In *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), an American clothing manufacturer that sold women's underwear in the U.S. and Canada using its "Vanity Fair" trademark sought to enjoin a Canadian retailer from selling women's undergarments using the same mark in Canada. We dismissed the claims against the defendant because it was a Canadian corporation using a mark to which it held presumably valid trademark rights in Canada. We explained the Supreme Court's application of the Lanham Act extraterritorially in *Steele v. Bulova* as resting on three factors: (1) whether the defendant's conduct has a substantial effect on United States Commerce; (2) whether the defendant is a citizen of the United States; and (3) whether there exists a conflict between defendant's trademark rights established under foreign law, and

---

**6.** Even these narrow exceptions for press conferences are further conditioned by the requirement that Bayer AG has to instruct the attending jour-

nalists not to use the "Bayer" name in the United States in connection with the subject matter of the press conference.

plaintiff's trademark rights established under domestic law. *Id.* at 642.

 In the instant case, the District Court granted an injunction with extensive extraterritorial effects without adequately considering its power to do so under the Lanham Act. The Court did not examine the *Vanity Fair* factors to see whether they supported an extraterritorial injunction, nor did it explicitly eschew the *Vanity Fair* analysis as inadequate for the instant facts. Because the District Court failed to make the necessary findings to support the extraterritorial reach of its injunction, we vacate the injunction's extraterritorial provisions and remand for further analysis as to the scope of such extraterritorial relief as may be warranted. In this connection, the District Court may receive such additional proofs as it may deem appropriate.

 Citing *Vanity Fair*, Bayer AG would have us forgo a remand in favor of a simple redrawing of the injunction to eliminate its extraterritorial provisions. Indeed, if we applied the *Vanity Fair* test mechanically to the instant case, we would forbid the application of the Lanham Act abroad against a foreign corporation that holds superior rights to the mark under foreign law. But such an unrefined application of that case might mean that we fail to preserve the Lanham Act's goals of protecting American consumers against confusion, and protecting holders of American trademarks against misappropriation of their marks. A more careful application of *Vanity Fair* is necessary because the instant case is not on all fours with *Vanity Fair*. In *Vanity Fair*, the plaintiff sought a *blanket prohibition* against the Canadian retailer's use of "Vanity Fair" in connection with the sale of defendant's products in Canada. Sterling, on the other hand, seeks to enjoin only those uses of the "Bayer" mark abroad that are likely to make their way to American consumers.[7] Sterling is not concerned with Bayer AG's use of the mark abroad so long as that use does not enter the channels of international communication that lead to the United States. While the stringent *Vanity Fair* test is appropriate when the plaintiff seeks an absolute bar against a corporation's use of its mark outside our borders, that test is unnecessarily demanding when the plaintiff seeks the more modest goal of limiting foreign uses that reach the United States. Though Congress did not intend the Lanham Act to be used as a sword to eviscerate completely a foreign corporation's foreign trademark, it did intend the Act to be used as a shield against foreign uses that have significant trademark-impairing effects upon American commerce.

Sterling contends that whatever issues might arise from the concurrent rights of the parties to the "Bayer" mark under both German and United States law have been eliminated by the decision of the Supreme Court in *Hartford Fire Insurance Co. v. California,* —— U.S. ——, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). The Court there ruled that considerations of "international comity" were not a bar to the extraterritorial application of the Sherman Act to alleged boycotting activities with a "substantial effect" in the United States. *Id.* at —— ——, 113 S.Ct. at 2909–10. In the context of the case before it, the Court found no "conflict" warranting a declination of jurisdiction because there was no claim that conformity with the requirements of United States law required the defendants to do any act in violation of British law. *Id.* at —— ——, 113 S.Ct. at 2910–11. Though the Court's approach to the comity issue might not be limited to the antitrust context, *see Restatement (Third) Foreign Relations Law* § 403 cmt. e (1987), we think it is not automatically transferable to the trademark context, especially where the contending parties both hold rights in the same mark under the respective laws of their countries. It is

7. Sterling seizes upon this distinction to argue that the instant injunction is therefore not an "extraterritorial" application of the Lanham Act at all. Brief for Appellee at 21. Sterling conflates the effect of the challenged *conduct* with the effect of the challenged *injunction*. While it is true that the injunction seeks to reach only the *domestic* effects of Bayer's *conduct*, it does so through the mechanism of an *extraterritorial injunction, i.e.,* one that prohibits Bayer AG from undertaking certain actions outside U.S. borders. The injunction has provisions that are clearly extraterritorial, including, for example, one that prohibits Bayer AG from advertising in foreign magazines such as *Der Spiegel* because their American circulations exceed 5,000 copies.

one thing for the British reinsurers in *Hartford Fire* to be barred under United States law from boycotting activity that they might be free to engage in without violating British law. But it is quite a different thing for the holder of rights in a mark under German law to be ordered by a United States court to refrain from uses of that mark protected by German law. In *Hartford Fire*, the Supreme Court appeared to recognize that a different context, such as a trademark dispute, might implicate other concerns:

> We have no need in this case to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity.

—— U.S. at ——, 113 S.Ct. at 2911.

We need not go so far as to limit the District Court's jurisdiction in order to oblige it to frame more carefully the scope of its injunction in light of the concurrent rights of the parties. "In establishing the parameters of injunctive relief in the case of lawful concurrent users, a court must take account of the realities of the marketplace." *Restatement of the Law of Unfair Competition, Tentative Draft No. 3* § 35 cmt. f (1991) (approved 1993). In today's global economy, where a foreign TV advertisement might be available by satellite to U.S. households, not every activity of a foreign corporation with any tendency to create some confusion among American consumers can be prohibited by the extraterritorial reach of a District Court's injunction.

Upon remand, the District Court may grant an extraterritorial injunction carefully crafted to prohibit only those foreign uses of the mark by Bayer AG that are likely to have significant trademark-impairing effects on United States commerce. If the Court finds that Bayer AG's use of the mark abroad carries such significant effects in the United States, the District Court may require Bayer AG to take appropriate precautions against using the mark in international media in ways that might create confusion among United States consumers as to the source of

"Bayer" pharmaceutical products in the United States. It might be appropriate, to take examples offered by appellee, to prevent Bayer AG from placing a full-page "Bayer" advertisement in the U.S. edition of a foreign magazine or newspaper, or inviting representatives of the U.S. press to an offshore briefing in which Bayer AG distributed materials describing "Bayer's" analgesics products for publication in the U.S. On the other hand, it might be inappropriate, to take examples offered by the *amicus curiae*, to leave the injunction so broad as to ban the announcement of new medical research in *Lancet*, or an employment notice in *Handelsblatt*, or a press conference in England to publicize a new over-the-counter remedy developed in the United States, or sponsorship of a German soccer team if that team might appear, wearing "Bayer" jerseys, on a television broadcast carried by an American sports cable channel.

In fashioning the injunction, the Court should "balanc[e] ... the equities to reach an *appropriate* result protective of the interests of both parties." *Soltex Polymer Corp. v. Fortex Industries, Inc.*, 832 F.2d 1325, 1330 (2d Cir.1987) (emphasis in original); *see also Jim Beam*, 937 F.2d at 737 (counseling District Court to weigh equities in fashioning injunctive relief on remand). Where, as in the instant case, both parties have legitimate interests, consideration of those interests must receive especially sensitive accommodation in the international context. While Bayer AG suggests that we must accept these conflicts as the unavoidable result of an international community of nations in which each nation exercises the power to grant trademark rights, we prefer to allow the District Court to fashion an appropriately limited injunction with only those extraterritorial provisions reasonably necessary to protect against significant trademark-impairing effects on American commerce.[8]

Sterling contends that if the extraterritorial provisions of the injunction cannot be sustained as a remedy for Bayer AG's Lanham Act violations, they should be sustained as a

---

8. We do not need to consider Bayer AG's First Amendment claim on this appeal because we anticipate that the District Court's modifications of the injunction on remand should eliminate the legitimate First Amendment concerns—if any—raised by the injunction as it now stands.

remedy for Bayer AG's contract violations. We disagree. The 1970 Agreement clearly recognized Bayer AG's "exclusive rights" to the "Bayer" mark outside the United States, Canada, and certain Caribbean nations. Indeed, it may be the case that the broad extraterritorial provisions of the injunction improperly rescind certain rights that Bayer AG purchased in the 1970 Agreement.[9] The 1964 Agreement and the 1986 modification to that Agreement restrict Bayer AG's use of the mark only inside the United States.

Since Sterling has not claimed that New York's unfair competition and anti-dilution laws have any broader extraterritorial reach in this case than the Lanham Act, we have no occasion to consider what relief might appropriately be predicated in a proper case on those sources of law.

2. Other challenges to the injunction

Some of the provisions of the injunction with primarily domestic effects are also defective and must be struck or reformed.

■■■ A. *Provisions prohibiting law and contract violations.* The District Court began its order of injunction in paragraphs 1(a) through 1(d) by enjoining Bayer AG from violating the particular laws and contracts upon which Sterling had based its action.[10] In the context of this litigation, where both parties have some rights to the mark at issue, these provisions of the injunction run afoul of Rule 65(d)'s mandate that orders granting injunctions "shall be specific in terms [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). *See Islip v. Eastern Air Lines, Inc.,* 793 F.2d 79, 84 (2d Cir.1986) (holding decree that banned violation of contract unenforceable); *Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244, 247 (2d Cir.1972) (affirming District Court refusal to grant order requiring defendants to obey statutory duty of fair representation).

Sterling defends paragraphs 1(a) through 1(d) of the injunction against Rule 65(d) objections on the ground that we have upheld other injunctions that trace the language of the law at issue. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 590 F.2d 701, 703 (2d Cir.1978) (per curiam); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103 (2d Cir.1972). Though an injunction that follows the language of the statute at issue may be appropriate in some cases where the context clarifies the scope of the injunction, we do not think that the instant setting provides the necessary illumination to sustain these otherwise vague injunctive provisions. In this case, where the parties share rights to the "Bayer" mark, both internationally and in the United States, requiring Bayer AG to guess—on pain of contempt—at what conduct the Lanham Act proscribes is too onerous a burden. *See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *Fonar Corp. v. Deccaid Services, Inc.,* 983 F.2d 427, 429–30 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 309, 126 L.Ed.2d 256 (1993).

The decree that the District Court devises on remand need not be so precise as to predict exactly what Bayer AG "will think of next," Brief for Appellee at 35, in using the

---

**9.** Sterling colorfully refers to this case as "The Great Trademark Robbery." Brief for Appellee at 1. But considering the fact that Bayer AG paid $25 million for limited rights to the "Bayer" mark in the United States, and $2.8 million for exclusive rights to most of the rest of the world, we think that at least certain aspects of this case may perhaps be better characterized as a sale than a holdup.

**10.** The District Court began its order by enjoining Bayer AG and its subsidiaries from

1. (a) violating any of the terms or provisions of:

(i) the February 8, 1964, agreement between Sterling Drug Inc. . . . and Bayer AG . . .; and
(ii) the January 2, 1986, agreement between Sterling and Bayer AG . . . .

(b) violating any of Sterling's rights in the trademark and trade name BAYER under the Lanham Trademark Act, 15 U.S.C. §§ 1051, *et seq.;*

(c) engaging in unfair competition with Sterling through their use of the trademark and trade name BAYER;

(d) violating N.Y.Gen.Bus.Law § 368–d through their use of the trademark and trade name BAYER. . . .

Judgment of Permanent Injunction (filed July 22, 1992).

"Bayer" mark. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949) (noting "necessity of decrees that are not so narrow as to invite easy evasion"). But neither can it be so broad as to prohibit generally all unlawful activity.[11] Paragraphs 1(a) through 1(d) cannot stand in their present form under Rule 65(d).

■ B. *Provision regarding medical symposia.* The District Court broadly banned Bayer AG from using the "Bayer" mark "in connection with any medical symposium, conference or seminar within the United States." Judgment of Permanent Injunction ¶ 1(g)(vii). Bayer AG challenges this restriction as interfering with the free flow of scientific knowledge. Sterling responds that the free flow of scientific information does not justify trademark infringement or breach of contract.

We conclude that the medical symposia provision sweeps too broadly. This provision impairs Bayer AG's ability to participate in U.S. medical symposia more than necessary to protect Sterling's trademark or contract rights. First, barring Bayer AG researchers from identifying their corporate affiliation in scientific settings serves no legitimate interest in protecting Sterling's trademark. Second, the parties' contracts do not go so far as to prohibit Bayer AG employees from mentioning the "Bayer" name at medical conferences. Under the 1986 Agreement, Bayer AG is barred from using the mark in "promotions" to the pharmaceutical industry or consumers in general. 1986 Agreement ¶ 2. Nevertheless, Bayer AG scientists working in Leverkusen, Germany, should be allowed to present their discoveries at a U.S. medical conference and to identify their affiliation in doing so. Any "promotional" value of such identification would be purely incidental, and would not justify a ban that impaired other scientists' ability to assess the work.[12] If Bayer AG intends to go beyond participation in U.S. medical symposia and wishes to use its name in sponsoring such symposia, it should be required to make clear that it has no connection with the U.S. manufacturer of "Bayer Aspirin." A disclaimer should normally suffice.

■ C. *Provision barring Bayer AG from using "Bayer" mark in the United States.* Paragraph 1(e) of the injunction prohibits Bayer AG from identifying itself by using the "Bayer" mark in the United States, subject to only a few limited exceptions. Bayer AG urges us to vacate this provision as unnecessary to achieve the goals of the Lanham Act or to vindicate Sterling's contract rights. Bayer AG apprehends that this provision would proscribe a host of ordinary business activities:

> Literal compliance with this remarkable provision would, for example, bar an executive of Bayer AG from identifying his business affiliation in a telephone call to a Miles employee, to a government official or to another company's executive during a business trip. Defendants could not register securities or make acquisitions in the U.S., since doing so would require identifying Bayer AG as the ultimate parent of the U.S. subsidiaries in a variety of legally required communications, including disclosures under U.S. securities laws. Defendants could not deal with U.S. banks, investment advisors or insurers, or access the U.S. capital markets—all of which require complete information about the corporate structure and finances of a customer's or borrower's affiliates. Indeed, if enforced to its absurd literal limits, paragraph 1(e) would make the filing of this brief—and the retention of U.S. counsel and their work on Bayer's behalf—punishable as a contempt of court.

Brief for Appellants at 31–32 (footnote omitted). If Bayer AG had been a domestic corporation without any rights to the "Bayer" mark, an injunction barring the above conduct might have been justifiable. *See, e.g., Communications Satellite Corp. v. Com-*

---

11. We cannot say that Bayer AG has shown the kind of "proclivity for unlawful conduct" that might justify a more general decree. *See McComb,* 336 U.S. at 192, 69 S.Ct. at 500.

12. We observe that the District Court could require references to Bayer AG in conference literature to be accompanied by a disclaimer that would distinguish Bayer AG from the U.S. manufacturer of "Bayer Aspirin."

cet, Inc., 429 F.2d 1245, 1253 (4th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970). But because Bayer AG is a German corporation with a valid trademark in the "Bayer" mark under German law, its legitimate interests in normal corporate activities such as raising capital and communicating with subsidiaries deserve some accommodation in the United States. Bayer AG points out that U.S. investors own almost one-half billion dollars in Bayer AG shares, and that U.S. newspapers have long listed Bayer AG's price on the Frankfurt stock exchange. We see no reason to prohibit such listings or to make it more difficult for American investors to learn about Bayer AG. Nor should Bayer AG be prevented from using its name in purely internal communications with its U.S. subsidiaries. We caution that Bayer AG should not be given unlimited license to promote its name to the American consuming public under the guise of soliciting investment. Furthermore, the District Court may require an appropriate disclaimer. As long as Bayer AG confines its use within appropriate bounds, any incidental adverse impact on Sterling's trademark would be too insignificant to justify preventing Bayer AG from raising capital in the United States and communicating with its shareholders under its own name.

■ The Lanham Act does not require a total ban on the use of a mark by an infringing junior user. To the contrary, the Lanham Act demands that injunctive relief be " 'no broader than necessary to cure the effects of the harm caused.' " George Basch Co., 968 F.2d at 1542 (quoting Soltex Polymer Corp., 832 F.2d at 1329). A near total ban on Bayer AG's use of the mark is not necessary to protect Sterling's trademark. Nor do we find any provision in the parties' agreements that requires Bayer AG to refrain from using the mark in communicating with investors or subsidiaries. The District Court should redraw this provision of the injunction to accommodate Bayer AG's global business interest's in raising capital and communicating with its subsidiaries.

■ D. *Provision barring naming any entity "Bayer USA Inc."* Paragraph 1(f) of the injunction bars Bayer AG from naming any entity in the United States "Bayer USA Inc." The Court enjoined Bayer AG from

> using the name "Bayer USA Inc." or any other name containing the word "Bayer" as the name of any company, corporation or other entity operating, incorporated or existing within the United States....

Judgment of Permanent Injunction ¶ 1(f). This provision effectively rescinds Bayer's express contract right to use "Bayer USA Inc." as the name of Bayer AG's U.S. holding company. Sterling's 1986 agreement with Bayer AG had provided:

> Sterling will not object ... to the ... use of "Bayer (USA) Inc." as a new corporate name of Rhinechem Corporation so long as it is a non-operating holding company, i.e., [a company] not trading in goods....

1986 Agreement ¶ 1.

Sterling urges that Bayer AG's right to the "Bayer USA" name was conditioned upon Bayer AG's using the name for a holding company that did "little more than keep the books," and that it lost that right when Bayer USA engaged in a public relations campaign. Brief for Appellee at 34. This argument is unavailing. First, the District Court did not find that Bayer USA ever violated the terms of the 1986 Agreement by "trading in goods." Second, even if Bayer USA had "trad[ed] in goods," the Court could have required only that it either cease "trading in goods" or discontinue using the "Bayer" name. An order banning Bayer AG from operating Bayer USA under that name under *any* circumstances would improperly rescind one of the rights for which Bayer AG had paid $25 million under the 1986 Agreement. Sterling alternatively argues that Bayer AG's activities entitled the Court to issue a broad injunction that would "fence in" Bayer AG. We see no reason to believe that Bayer AG will not abide by the terms of the 1986 Agreement in using the Bayer USA name for its holding company in the United States. Accordingly, no "fencing in" is necessary.

### III. Cross–Appeal

Sterling attempts to cross-appeal from the District Court's ruling refusing to award attorney's fees in its favor under the Lanham

Act's "exceptional case" standard. *See* 15 U.S.C. § 1117(a) (1988). Recognizing that, in the absence of a final judgment disposing of all claims, our jurisdiction over this interlocutory appeal is based on the District Court's injunction, *see* 28 U.S.C. § 1292(a)(1) (1988), Sterling contends that the fee issue is within the scope of the interlocutory appeal, or, alternatively, that we should consider it in the exercise of pendent appellate jurisdiction. We disagree. The issue of attorney's fees involves a consideration of whether Bayer AG has acted in bad faith, a matter more appropriately considered after a complete airing of all aspects of the dispute between the parties.[13] The cross-appeal is dismissed.

## Conclusion

We affirm the District Court's rulings concerning trademark infringement, vacate the remedial injunction and remand for entry of a modified injunction, and dismiss the cross-appeal. No costs.

---

**13.** Sterling offers two cases in support of its argument that the order granting the injunction brings the attorney's fees decision before us for review at this time. Neither of the cases Sterling cites is availing. In *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir. 1972), we reaffirmed the basic principle that an appeal under 28 U.S.C. § 1292(a)(1) "brings before us the entire order and not merely the propriety of the granting of the injunctive relief."

And in *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940), the Supreme Court declared that an appeals court could, in appropriate circumstances, dismiss the entire action on an interlocutory appeal. Neither of these cases supports an assertion of appellate jurisdiction over a non-dispositive interlocutory ruling that is not part of the order granting the injunction.