NATIONAL DISTILLERS PRODUCTS CO., LLC, Plaintiff,

v.

REFRESHMENT BRANDS, INC., Wine Merchants/Buff, Wine Merchants of Syracuse, Ltd., and Wine Merchants of Schenectady, Ltd. Defendant.

No. 00 CIV. 8418(NRB).

United States District Court, S.D. New York.

April 15, 2002.

Arlana S. Cohen, Esq., Michael G. Gabriel, Esq., St. Onge, Steward, Johnston & Reens, Stamford, CT, Counsel for Plaintiff.

Bruce R. Ewing, Esq., Marc S. Reiner, Esq., Dorsey & Whitney LLP, New York, Counsel for Defendants.

**OPINION AND ORDER**

BUCHWALD, District Judge.

National Distillers Products Co., LLC ("National") brought this trademark action against Refreshment Brands, Inc. ("RBI") and several other defendants. The parties consented to a bench trial which was held on February 5–8, 2002.[1] The following Opinion constitutes our findings of fact and conclusions of law. As discussed below, we find for the defendants on all counts.

**BACKGROUND**

**A. Parties**

■ National was founded in 1996 by three partners in order to market and sell an 80–proof potato vodka. They named the vodka "Teton Glacier" and registered TETON GLACIER with the United States Patent and Trademark Office.[2] National does not own a distillery, but rather contracts with one located in Rigby, Idaho.[3] From the beginning, National wanted to market Teton Glacier as an "ultra-premium" vodka, in competition with brands such as Grey Goose and Belvedere. Accordingly, National instructed retailers to

1. At trial, the following persons testified for the plaintiff: John Salisbury, partner and one of the founders of National, Martha Williams Morley, public-relations expert hired by National to promote Teton Glacier, Thomas Coppini, President and CEO of National, Raymond Foley, bartending expert, Carolyna Krause, vice-president of Niche Imports, a firm hired by National to market Teton Glacier, Donald Fanelli, another National partner, Michael Rappeport, trademark survey expert, and Christopher Spadea, financial expert; and these persons testified on behalf of the defense: Jason Kane, founder and majority shareholder of RBI, James Hazzard, general sales manager for Wine Merchants, Gregory Meath, trademark counsel for RBI, Larry Davenport, vice-president for sales for RBI, Joseph Aglione, intellectual property investigator, Robert Bernstein, vice-president of marketing for Seagram's, and George Mantis, trademark survey expert.

2. While it is true that National's registered trademark is for TETON GLACIER HAND CRAFTED AMERICAN VODKA and design, and not merely for TETON GLACIER, "it is proper to recognize that one feature of a mark is more significant than the other features and to give greater force and effect to that dominant feature." *Burger Chef Sys., Inc. v. Sandwich Chef, Inc.,* 608 F.2d 875, 878 (C.C.P.A.1979). There is no doubt that TETON GLACIER is the dominant part of the mark, as the font used for the words HAND CRAFTED AMERICAN VODKA is only one-quarter the size of the font used for the words TETON GLACIER. Moreover, HAND CRAFTED AMERICAN VODKA is merely a description of the product.

3. The Grand Tetons of Wyoming are visible from the distillery in Rigby.

price Teton Glacier at the high levels commanded by ultra-premium vodkas and specifically refrained from offering price discounts. In addition, National sought to make Teton Glacier known to the most affluent members of society by sponsoring events such as polo matches, the Junior League Winter Ball, and sailing regattas, and by becoming the exclusive vodka offered at Royal Caribbean Cruise Lines's caviar bars.

Nevertheless, Teton Glacier has not been a successful product. One of National's partners, John Salisbury, testified that he hoped to sell 40,000–100,000 cases per year in order to make the Teton Glacier brand attractive enough to be purchased by a larger alcoholic beverage company. In its best year, however, Teton Glacier sold fewer than 8,000 cases, and has sold fewer than 30,000 cases in toto since its introduction. By way of comparison, Absolut vodka sells 4,000,000 cases per year, and Belvedere vodka sells 200,000 cases per year. Even Relska, the thirtieth-ranked domestic vodka, sold approximately 162,000 cases in 2000, and Three Olives vodka, a relatively obscure British vodka first introduced in 2000, sold 25,000 cases that year.

RBI, on the other hand, was founded by two partners in 1999 with the intent to market and sell a "vodka cooler" that they named "Glacier Bay."[4] A "cooler" is a broad term that encompasses many types of alcoholic beverages that combine small amounts of alcohol, such as wine, malt liquor, or spirits, with some type of "mixer," such as fruit juice or carbonated water. The result is a sweet-tasting beverage with the approximate alcohol content of a beer. Well-known cooler brands include Bartles & Jaymes and Smirnoff Ice. Coolers are most popular with women and ethnic minorities in urban ares. RBI has had significant success with their Glacier Bay product, selling 550,000 cases in 2001.

## B. Facts

On May 6, 1997, the United States Patent and Trademark Office granted National a registration for their trademark TETON GLACIER: AMERICAN HANDCRAFTED VODKA and design. See Pl.'s Ex. 1. "Teton" is set out in script above a black box in which "Glacier" is written in white interlined Roman font lettering. Above these words are a sketch of two mountains with a "sun" rising between them, and the words "Hand Crafted American Vodka" in an arc above the mountains. National has made efforts to protect its trademark. They have, for example, written numerous "cease and desist" letters to entities who had plans to use the words "glacier" and "vodka" together for products other than Teton Glacier.[5] Many, but not all,[6] letter recipients

---

4. RBI presently holds a federal trademark for GLACIER BAY.

5. We note, however, that National was not particularly energetic with respect to the claimed infringement at issue here. National first became aware in the summer of 1997 of RBI's intention to launch Glacier Bay, Tr. at 200–01, and Glacier Bay was subsequently launched that Fall. National did not file the instant complaint, however, until November 2, 2000, more than a year after RBI's launch, and did not serve the complaint until March 2, 2001, the final day it was permitted to do

so before facing dismissal pursuant to Fed. R.Civ.P. 4(m).

6. Finlandia, for example, was apparently undaunted by National's efforts to prevent it from marketing a martini made with Finlandia vodka called the "Naked Glacier Martini." Although Mr. Salisbury testified that Finlandia abandoned its plan to market the Naked Glacier Martini, evidence adduced at trial indicated that Finlandia had indeed gone through with their intended promotion of the Naked Glacier Martini. In addition, Mr. Salisbury testified that he wrote a letter to

did, in fact, abandon their plans upon learning of National's opposition.

In 1999, RBI placed a "teaser" advertisement in a trade magazine announcing its soon to be released Glacier Bay product. Upon becoming aware of this advertisement, National telephoned RBI and then sent a cease and desist letter on September 30, 1999. RBI consulted their attorney, Gregory Meath, for advice. Mr. Meath advised RBI that their use of the GLACIER BAY trademark in connection with their cooler product would not infringe National's rights in TETON GLACIER. Accordingly, RBI went ahead and launched their product in October of 1999. More than a year later, on November 2, 2000, National filed a complaint in this Court against RBI.

## C. Claims

Although National's First Amended Complaint included twelve Counts, three of them were withdrawn either before or dur-

ing trial.[7] The remaining Counts allege three distinct types of claims.

First, National claims that RBI has infringed their registered trademark, TETON GLACIER, as well as their "family" of unregistered trademarks, namely, GLACIER and GLACIERVODKA.COM, by marketing and selling their products under the registered trademarks GLACIER BAY VODKA REFRESHMENT and GLACIER BAY NIGHTS. National also claims that the trade dress used by RBI in connection with Glacier Bay infringes the unregistered trade dress used for Teton Glacier. These claims are brought under sections 2(d), 32(1), and 43(a)(1)(A) of the Lanham Act, as well as the common law.

Second, National asserts claims under New York law and the Lanham Act that RBI's production, marketing, and sale of their Glacier Bay product dilutes the value of the Teton Glacier family of marks. Finally, National claims that RBI has violated New York's unfair competition and

Frank–Lin Distilled Products, Ltd. ("Frank–Lin"), requesting that it cease and desist from selling "Glacier Bay" full-strength vodka. This letter, dated October 21, 1996, was introduced into evidence. Pl.'s Ex. 113. Mr. Salisbury further testified that Frank–Lin did, in fact, stop selling vodka under the name "Glacier Bay." RBI, however, introduced a receipt from a Save Mart Supermarket in Turlock, Cal., that indicated the purchase of "Glacier Bay" vodka on January 25, 2002. Def.'s Ex. 190.

Additionally, with respect to Frank–Lin's "Glacier Bay" vodka, evidence adduced at trial demonstrated that Frank–Lin had registered the "Glacier Bay" label with the BATF well before National registered its TETON GLACIER trademark. Compare Pl.'s Ex. 67 (BATF approved Frank–Lin's "Glacier Bay" label for "domestic vodka 80–90 proof" on October 24, 1995) with Pl.'s Ex. 1 (National received its federal trademark for TETON GLACIER on May 6, 1997). According to National partner John Salisbury, National was actually aware of Frank–Lin's product before it sought to register TETON GLACIER.

Tr. at 135. Thus, National's claim that RBI's use of GLACIER BAY for a cooler has caused consumer confusion is undermined by its decision to adopt the TETON GLACIER mark knowing that Frank–Lin had used the name "Glacier Bay" for a full-strength vodka. In this regard, it should be remembered that National affirmed when it filed its trademark application that "no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when applied to the goods or services of the other person, to cause confusion or mistake." 37 C.F.R. § 2.33(b)(1).

7. In a Stipulation and Order dated November 28, 2001, Count 10, "Cancellation of BATF Approval," was dismissed with prejudice. At trial, the plaintiff withdrew Counts 8 and 9, both captioned, "False Advertising Under Section 43(a) of the Lanham Act." Tr. at 420. Furthermore, although the plaintiff discussed a theory of reverse confusion in its Proposed Findings of Fact and Conclusions of Law, it withdrew this theory from consideration midway through trial. Id. at 419.

false advertising statutes. For the reasons that follow, we find for the defendants on all counts.

## DISCUSSION

### A. Trademark Infringement

■ To prove its trademark infringement claims (Counts 1–3 and 5–7), National had to prove that it was probable that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir.1993). Specifically, National had to show a likelihood that consumers would mistakenly believe that the Glacier Bay vodka cooler product emanated from the producers of Teton Glacier. In analyzing this question, we are guided by the well-known *Polaroid* factors. We begin with National's claim that RBI infringed its registered trademark, TETON GLACIER.

### 1. Strength of the Mark

■ The first factor we consider is the strength of the TETON GLACIER mark.[8] Strength, in trademark law, has two components, inherent strength, or distinctiveness, on the one hand, and commercial strength, or secondary meaning, on the other. To determine the inherent strength, we must classify plaintiff's mark as generic, descriptive, suggestive, or arbitrary/fanciful, listed in ascending order of strength. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). It is clear that TETON GLACIER is suggestive. It is not totally arbitrary, as "glacier" suggests the coolness of

vodka, often served on ice, and "Teton" suggests the famous Grand Teton mountains of Wyoming, which are visible from the plaintiff's distillery. As the mark requires some imagination on the part of the purchaser to determine the nature of the product, it is suggestive. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir.1999). TETON GLACIER, thus, has significant inherent strength. *See id.*

■ "When determining whether either a suggestive or descriptive mark is a strong one for purposes of the Polaroid inquiry, we look to the secondary meaning that the mark has acquired, because the ultimate issue to be decided is the mark's origin-indicating quality in the eyes of the purchasing public." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2d Cir.1996) (internal quotations and citations omitted). In examining the degree to which a mark has acquired secondary meaning, or commercial strength, we consider the six factors laid down in *Centaur Communications, Ltd. v. A/S/M/ Communications*, 830 F.2d 1217, 1222 (2d Cir.1987), namely, advertising expenditures, consumer studies linking the mark to the source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use. Each will be discussed in turn.

First, National has spent a total of approximately $550,000 on advertising and marketing since its inception in 1996, for an average of about $100,000 annually. To put this in perspective, Absolut spends over $20,000,000, and Grey Goose over

---

**8.** We acknowledge that National has registered the TETON GLACIER trademark with the United States Patent and Trademark Office. This registration does not, however, "alter the breadth of infringement protection that a mark is accorded. As a general matter, registration creates no substantive trademark rights against infringement beyond the common law rights acquired through use of the mark." *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir.1999).

$4,000,000, per year on advertising. Furthermore, it was established at trial that National has published only four print ads aimed at consumers. Second, plaintiff has offered no consumer studies linking TETON GLACIER to its source, National. Third, while National has presented numerous instances of media coverage of TETON GLACIER vodka, it is clear that such coverage was, in large part, in response to the efforts of a public relations firm hired by National. Fourth, TETON GLACIER has had very little sales success. It is only available in about 2/3 of the states, and has sold fewer than 30,000 cases for about $3,500,000 since its launch. Indeed, it is one of the weakest selling of the hundreds of vodkas on the United States market. Fifth, plaintiff has offered no evidence of attempts to plagiarize the mark. Finally, TETON GLACIER has only been in use for six years and, moreover, it is only one of many alcoholic beverage marks that use word "Glacier." Defendant has produced, *inter alia*, specimens of GLACIER beer, GLACIER'S END wine, and even GLACIER BAY full-strength vodka. Considering all these factors, particularly the minimal sales figures, it is obvious that TETON GLACIER has very little commercial strength.

In sum, while TETON GLACIER has significant inherent strength, it has negligible commercial strength. Therefore, this factor favors neither party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123 (2d Cir.2001) (because "[e]ven an inherently distinctive mark can, in its commercial context, lack strength as a mark," plaintiff's mark was weak due to "its low level of commercial success and small advertising budget relative to market competitors at the relevant time"); *Mondo, Inc. v. Sirco Int'l Corp.*, 1998 WL 849401, at *5–*6 (S.D.N.Y. Dec.7,

1998) (inherent strength of party's arbitrary mark was "seriously diminished" by its lack of commercial strength).

### 2. Similarity of the Marks

■ Second, we consider the similarity between the TETON GLACIER and GLACIER BAY marks. The test is whether the marks convey the same general overall impression when viewed separately, considering all the aspects of each. *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 117 (2d Cir.1984). It is improper to dissect fragments of the marks for this purpose. *Id.* Thus, while both marks incorporate the word "Glacier," the entire look and feel of the two marks are far from identical. First, the names of the products are different. Second, while both marks incorporate a picture of mountains, the pictures look significantly different from one another. Nor can we ignore the significant differences in the manner in which the two products are bottled. TETON GLACIER is bottled in large single bottles of 750 ml. or more,[9] while GLACIER BAY is usually sold in cardboard four-packs of smaller bottles. In sum, we find that this factor favors neither party.

### 3. Proximity of the Products

The third *Polaroid* factor is whether and to what extent the TETON GLACIER and GLACIER BAY products compete against one another in the marketplace. Although both products are made from vodka, National has failed to convince us that they compete with one another in the market. Teton Glacier is an "ultra-premium" full-strength vodka marketed to the most affluent members of society, such as those who attend sailing regattas and polo matches, and costs about $25 for a 750 ml. bottle.

9. With the exception of the single-serving novelty size.

Glacier Bay, on the other hand, is a low-alcohol cooler popular with women and inner-city minorities, and is sold at retail for $3.99–$7.99 for a four-pack of twelve-ounce bottles or $2.99–$3.99 for a 750 ml. bottle.[10] Teton Glacier is frequently sold in bars, while Glacier Bay is sold in bars only rarely. Finally, Glacier Bay is sold in supermarkets, and is usually stored in a refrigerated case, while Teton Glacier is usually sold in liquor stores, and is almost never stored in a refrigerated case. In short, the two products are simply not in competition with one another, and this factor strongly favors RBI.

### 4. Likelihood That Plaintiff Will Bridge the Gap

While we have already determined that the two products are not presently in competition, this factor requires us to determine the likelihood that National will, in the future, enter GLACIER BAY's market. John Salisbury, one of National's partners, testified that there were no plans for National to produce a cooler product under the TETON GLACIER trademark that would compete with Glacier Bay. While Thomas Coppini, another partner, expressed a vague interest in selling a high-end, ready-to-drink cocktail sometime in the future, we are not persuaded that there is a significant likelihood that National will ever bridge the gap and produce a cooler, especially considering that it appears that no high-end or ultra-premium brand of spirits has produced a cooler.[11] This factor favors RBI.

### 5. Actual Confusion

■ Plaintiff offered both anecdotal evidence and an expert survey in an attempt to prove actual confusion as to the source of Glacier Bay among consumers. The anecdotal evidence amounted to fewer than five instances in which wholesale purchasers or distributors of Teton Glacier asked employees of National whether they produced Glacier Bay. In each case, however, the confusion was dissipated before any purchases were made, because National's employees explained that there each product came from a different source. Moreover, despite their extensive contact with members of the alcoholic beverage industry, the owners of RBI have never encountered any confusion between the two brands. Other instances of actual confusion did not survive cross examination.

National offered a survey conducted by Michael Rappeport (the "Rappeport Survey") in an attempt to prove actual confusion. The Rappeport Survey was conducted in various shopping malls across the country, and is a so-called "two-room" survey. Subjects were chosen at random, but only those who indicated that they drink "[l]iquor, such as gin, rum, tequila, or vokda" on average at least once a month were selected to be interviewed. In the first "room," the interviewer showed the subject the TETON GLACIER label, without the bottle to which it is normally attached. Then, in the second room, the subject was shown seven or eight empty cooler bottles [12] and told, "Some, all, or none of these

---

**10.** The variations in price are due to differences in state taxes, as well as different profit margins sought by the various distributors and retailers.

**11.** Indeed, to market a low-cost cooler would appear to be contrary to National's effort to obtain a cachet for Teton Glacier.

**12.** There were actually three different arrays presented to subjects, but all three included empty bottles of coolers such as Club Vodka Martini, Kahlua White Russian, Smirnoff Ice, and Jack Daniel's Country Cocktails. The first array was comprised of these cooler bottles as well as a small single-serving Teton Glacier bottle with the same label as that shown in the first room, the second array was

alcoholic beverages may come from the same maker or company as the product on the card I showed you [in the first room]. Which, if any, of these alcoholic beverages do you think come from the same maker or company as the product on the card I showed you [in the first room]?" Mr. Rappeport testified that, after controlling for "noise,"[13] 38% of the subjects believed that Glacier Bay was affiliated with Teton Glacier.

RBI commissioned their own survey, which was conducted by George Mantis (the "Mantis Survey"). The subjects chosen were persons 21 years of age or older and who had purchased or consumed a cooler product within the previous ninety days, or who were likely to purchase such a product within the next ninety days. The Mantis Survey was not a "two-room" survey, but rather a "single exposure" design, similar to the well known *Ever–Ready* survey. *See Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 385 n. 11 (7th Cir.1976). In the Mantis Survey, the subjects were shown either a bottle and four-pack of Glacier Bay, or a bottle and four-pack of a fictitious "Arctic Bay" product as a control. The Arctic Bay product was created by modifying the Glacier Bay product by changing the word "Glacier" to "Arctic," the abbreviation "GB" to "AB," and by removing the mountains from the Glacier Bay label. The subjects were shown either the Arctic Bay or Glacier Bay products and permitted to examine them for as long as they wished. The products were then taken away and the subjects were asked a series of questions, to wit: "What company or companies do you think makes or puts out this product?", "Whether you know the name of the company that makes this product, are you aware of any other products or brands put out by this company?", if yes, then, "What other products or brands do you think are put out by the company that makes this product?", and "If you have an opinion, do you think that the company that makes this product did or did not get approval or permission from any other company or companies in order to put out this product?" Not a single respondent out of the approximately 300 interviewed associated either Glacier Bay or Arctic Bay with Teton Glacier or National.

 While surveys such as these are generally admissible, they must "have been fairly prepared and [their] results [must be] directed to the relevant issues" to be probative of a likelihood of confusion. *Nintendo*, 746 F.2d at 118 (internal quotation marks and citations omitted). Thus, we consider several factors in determining the weight a survey should be given. These factors are whether:

(1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir.1999).

comprised of the cooler bottles and the Glacier Bay bottle, and the third array was comprised of the cooler bottles as well as both the small Teton Glacier bottle and the Glacier Bay bottle.

**13.** In an experiment or statistical study, the "noise" is the variation in the data being collected that is not believed to be caused by the variables being tested.

We find two major flaws in the Rappeport survey that persuade us that it does not reliably indicate the existence of actual confusion. First, we find that the "universe" was not properly defined. The proper universe in a forward confusion case is the universe of potential purchasers of the junior user's product, here, the cooler drinkers who may purchase Glacier Bay. *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 559–60 (S.D.N.Y.1991). The Rappeport Survey, however, chose a universe of respondents who regularly consume "liquor, such as gin, rum, tequila, or vodka." We are not convinced that this definition would generate a universe of potential Glacier Bay purchasers because the evidence adduced at trial demonstrated that the liquor and cooler markets are not coextensive. *See* Part A.3, *supra.*

The second major flaw we discern in the Rappeport Survey is that every respondent was exposed to the Teton Glacier product in the first room, thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to Teton Glacier's very limited distribution network and weak sales. Thus, the Rappeport Survey cannot be relied upon to establish that consumers would mistakenly believe that Glacier Bay was affiliated with Teton Glacier. *See Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1248 (S.D.N.Y.1987) ("The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone.").

Apart from these two glaring flaws in the Rappeport Survey, there were other methodological errors that prevented it from replicating actual market conditions. First, the respondents were shown the Teton Glacier label on a card, rather on a bottle,[14] as they would encounter the label in the marketplace. Second, while the cooler bottles would obviously be full when sold in the marketplace, they were empty when shown to the subjects of the Rappeport Survey. This may have been significant because many coolers, including Glacier Bay, are produced in various bright colors. In sum, the Rappeport Survey simply did not sufficiently replicate marketplace conditions to make it a reliable indicator of actual confusion in the marketplace.

The Mantis Survey, on the other hand, is much more reliable because it more accurately approximates actual market conditions. For example, subjects were not made artificially aware of Teton Glacier or the TETON GLACIER trademark. Most importantly, however, the Mantis Survey selected an appropriate universe of respondents, namely, cooler consumers. In short, we find the Mantis Survey to be more reliable than the Rappeport Survey and conclude that this important factor strongly favors RBI.

### 6. Defendant's Good Faith in Adopting the Mark

The founders and owners of RBI testified that they selected GLACIER BAY as their mark because they thought it would lead to the success of their product, and not with an intent to "cash in" on the reputation of Teton Glacier, a brand of which they were not aware. Considering

---

**14.** This problem is exacerbated by the fact that Teton Glacier is often sold in a distinctive decanter. Furthermore, this problem rendered the Rappeport Survey wholly inapplicable to the issue of trade dress infringement.

the low sales and relative obscurity of Teton Glacier, as well as the lack of impeachment evidence, we credit their testimony. Furthermore, RBI began to use their GLACIER BAY mark only after consulting with their attorney who had ordered a full Thompson & Thompson trademark search and determined that they were free to use the GLACIER BAY mark. While National had sent them a cease and desist letter, it did not change the opinion of RBI's attorney that there was no likelihood of confusion between the products. As the present discussion makes clear, we think this opinion was correct. In sum, we find no bad faith on the part of RBI, and, accordingly, this factor too favors the defendant.

### 7. Quality of Defendant's Product

RBI's partners testified that Glacier Bay is a high-quality cooler. Jason Kane, the majority shareholder of RBI, testified that Glacier Bay is made with citrus and grape vodka that is more expensive than a generic grain vodka. Furthermore, it has shown strong sales, which may indicate that the product is of a good quality. National offered no evidence to contradict this characterization. While it may not be as high-quality a product as the "ultra-premium" Teton Glacier, we have no reason to believe that Glacier Bay is of poor quality. Accordingly, this factor favors RBI.

### 8. Sophistication of the Relevant Consumers

The relevant consumers are the purchasers of Glacier Bay. No specific evidence was put forth by either side as to the sophistication of this group of consum-

ers. Accordingly, we find that this factor favors neither party.

### 9. Conclusion

We have found that five *Polaroid* factors favor RBI and that three favor neither party. Balancing these factors,[15] it is our conclusion that National has not met their burden to prove a likelihood of confusion.

### 10. Trade Dress and Other Marks

██ Next, we consider National's trade dress infringement claim. The only distinctive trade dress used in connection with the TETON GLACIER mark is the 750 ml. decanter. It is beyond purview, however, that there is no similarity between this decanter and any of the various trade dresses used in connection with the GLACIER BAY mark. Moreover, National introduced no evidence of copying, and, indeed, RBI's owners credibly described the creative process that led to their selection of trade dress as one that took place without any awareness of Teton Glacier's trade dress. Accordingly, there is no likelihood of confusion, and National's claim must fail.

 Finally, we consider National's claims with respect to the unregistered marks GLACIER and GLACIERVODKA.COM under § 43(a) of the Lanham Act. An unregistered trademark may be protected against infringement under § 43(a), but only if a plaintiff can show that "it has a valid [trade]mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997) (alteration in original) (internal quotation marks and citation omitted). "In order to qualify for trademark protection, a mark must be dis-

---

**15.** While we took all the *Polaroid* factors into account in reaching this conclusion, we found the commercial weakness of Teton Glacier, the lack of competitive proximity between the products, and the lack of evidence of actual confusion to be especially probative.

tinctive, that is, it must be capable of distinguishing the user's goods from others." *Supreme Wine Co., Inc. v. American Distilling Co.,* 310 F.2d 888, 889 (2d Cir.1962). As there are numerous other trademarks registered for alcoholic beverages that incorporate the word "Glacier," it is highly unlikely that GLACIER or GLACIERVODKA.COM are distinctive in this way. In addition, the above *Polaroid* analysis is fully applicable to the question of consumer confusion with respect to these unregistered marks. As we have previously found no likelihood of confusion with respect to TETON GLACIER, it follows that there is no likelihood of confusion with respect to GLACIER or GLACIER-VODKA.COM. Hence, National has failed to demonstrate the infringement of a protected trademark right in either GLACIER or GLACIERVODKA.COM.

Moreover, it is well-settled that "when less than the whole of a plaintiff's mark is used by a defendant, in order to sustain a charge of infringement, 'it must appear that the part ... taken identifies the owner's product without the rest.'" *Caron Corp. v. Ollendorff,* 160 F.2d 444, 445 (2d Cir.1947) (quoting *Parfumerie Roger & Gallet v. M.C.M. Co., Inc.,* 24 F.2d 698, 699 (2d Cir.1928)). As the above discussion makes clear, we find that plaintiff has not established that GLACIER, standing alone and apart from TETON, identifies National's product to an appreciable number of consumers. Accordingly, National's claim for infringement of their unregistered trademarks fails.[16]

**B. Trademark Dilution**

 To prevail on a federal dilution claim, National has the burden of proving, *inter alia,* that TETON GLACIER is a "famous" mark within the meaning of § 43(c) of the Lanham Act. The Second Circuit has recently made clear that § 43(c) is only intended to protect truly famous marks, such as DUPONT, BUICK, and KODAK. *See TCPIP Holding Co. v. Haar Communications Inc.,* 244 F.3d 88, 99 (2d Cir.2001). Considering the weakness of the TETON GLACIER family of marks, particularly with respect to the marks' strength in commerce, it is clear that none of the TETON GLACIER family of marks qualify as famous under the stringent test laid down in *Haar.* Accordingly, we find for the defendant on the federal dilution claim.

 While the New York dilution statute does not require that the allegedly diluted mark be "famous," in order to merit protection, the plaintiff must possess a mark that "truly [has a] distinctive quality or which ha[s] acquired a secondary meaning in the mind of the public." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544–45, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). As the foregoing discussion makes plain, National has failed to convince us that TETON GLACIER is so distinctive and well-known to the public to pass the *Allied* test. Thus, we find for the defendant on the New York dilution claim.

**C. New York Unfair Competition and False Advertising**

 Finally, National asserts a cause of action based on §§ 349 and 350 of the New York General Business Law. It is well settled, however, that trademark or trade dress infringement claims are not cognizable under these statutes unless there is a specific and substantial injury to

---

**16.** As we have found no likelihood of confusion between National's and RBI's products, we refuse to cancel RBI's trademark registrations for GLACIER BAY VODKA REFRESHMENT and GLACIER BAY NIGHTS, as requested by National.

the public interest over and above ordinary trademark infringement or dilution. *U–Neek, Inc., v. Wal–Mart Stores, Inc.*, 147 F.Supp.2d 158, 176 (S.D.N.Y.2001) (sections 349 and 350 "require the sort of offense to the public interest which would trigger FTC intervention under 15 U.S.C. § 45"); *Federal Trade Comm'n v. Royal Milling Co.*, 288 U.S. 212, 216, 53 S.Ct. 335, 77 L.Ed. 706 (1933) (mere misrepresentation and confusion on the part of purchasers or even that they have been deceived is not enough" to trigger 15 U.S.C. § 45). Plaintiff has made no showing on the issue of injury to the public interest. Accordingly, we find for RBI on this claim.

## CONCLUSION

For the reasons stated above, we find for RBI on all counts.

**IT IS SO ORDERED.**