FRIESLAND BRANDS, B.V., Plaintiff,

v.

VIETNAM NATIONAL MILK COMPA-
NY a/k/a Vinamilk and Tsai's Inter-
national Trading Co., Defendants.

No. 00 CIV.4287 GWG.

United States District Court,
S.D. New York.

Sept. 25, 2002.

Charles H. Knull, Cynthia H. Fareed, Graham, Campaign, P.C., New York, NY, for plaintiff.

Jeffrey A. Schwab, Richard L. Crisona, Abelman, Frayne & Schwab, New York, NY, for defendants.

## OPINION AND ORDER

GORENSTEIN, United States Magistrate Judge.

Before the Court is the motion *in limine* of defendants Vietnam National Milk Company and Tsai's International Trading Co. (collectively, "Vinamilk") to preclude the admission into evidence of a consumer survey, an art historian's report and related testimony. Plaintiff Friesland Brands B.V. ("Friesland") opposes the motion. The parties have consented to this case being adjudicated by a United States Mag-

istrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the motion is denied.

## I. FACTUAL BACKGROUND

Friesland is the owner of a trademark containing, among other elements, its brand name "Longevity," a drawing of an old man, and several Chinese ideograms. Friesland uses the trademark on the labels of 14–ounce cans of condensed milk (the "Longevity Brand"). Vinamilk also makes a condensed milk product sold in 14–ounce cans, which bear several different labels. Labels on the Vinamilk cans contain, among other elements, a drawing of an old man as well as several Chinese ideograms.

Friesland alleges the labels that Vinamilk applies to its condensed milk cans infringe or dilute the Longevity Brand mark. The Amended Complaint asserts six claims: federal trademark infringement, 15 U.S.C. § 1114(1); federal dilution, 15 U.S.C. § 1125(c); federal unfair competition, 15 U.S.C. § 1125(a); common law unfair competition; New York deceptive practices, N.Y. Gen. Bus. L. § 133; and New York Anti-dilution, N.Y. Gen. Bus. L. § 368(d). Amended Complaint at 9–14.

In support of its claims, Friesland has offered a survey by Harry W. O'Neill, a consumer survey expert, on the results of a consumer survey that sought to determine to what extent, if any, consumers are likely to believe that Longevity condensed milk comes from the same source as one of the Vinamilk condensed milk cans. Declaration of Jeffrey A. Schwab In Support of Defendants'/Counterclaim Plaintiffs' Motion to Strike the Reports and To Preclude the Testimony of Elizabeth Brotherton and Harry O'Neill, dated February 15, 2002, Exhibit B (the "O'Neill Survey"). Friesland has also offered the report of Elizabeth Brotherton, an art historian who has expertise in Chinese culture, describing the meaning of the Chinese ideograms

on the condensed milk can labels and describing the depiction of the old man on the labels, which Brotherton states is understood in Chinese communities to be the "God of Longevity." See id., Exhibit A (the "Brotherton Report").

Discovery has concluded in this matter. Vinamilk has now moved in limine to preclude Friesland from offering the consumer survey, the Brotherton Report or testimony relating to either.

## II. DISCUSSION

Trademark law protects a first user of a trademark by "barring a later user from employing a confusingly similar mark, likely to deceive purchasers as to the origin of the later user's product, and one that would exploit the reputation of the first user." Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 742 (2d Cir.1998) (citing Spring Mills, Inc. v. Ultracashmere House, Ltd., 689 F.2d 1127, 1135 (2d Cir. 1982)). The "crucial" issue in cases claiming trademark infringement and unfair competition "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, 115 (2d Cir.1984) (citations omitted). See 15 U.S.C. § 1125(a)(1) (permitting suit for the use of "any word, term, name, symbol, or device … or any false designation of origin, false or misleading description of fact … which [ ] is likely to cause confusion").

Likelihood of confusion ordinarily is analyzed by weighing the eight factors described in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.1961). See Streetwise, 159 F.3d at 743. These factors are the (1) strength of plaintiff's mark; (2) similarity between the plaintiff's mark and the challenged mark; (3) com-

petitive proximity of the products; (4) likelihood that the plaintiff will eventually produce a product like the challenged product, thereby "bridging the gap"; (5) actual confusion; (6) defendant's good faith or lack thereof; (7) quality of the defendant's product as compared to plaintiff's product; and (8) relative sophistication of prospective and actual purchasers of the products. *Polaroid,* 287 F.2d at 495. These eight factors are not dispositive and other circumstances may be relevant to the likelihood of confusion analysis, depending on the particular case. *See Streetwise,* 159 F.3d at 743.

The O'Neill Survey and the Brotherton Report are being offered to support plaintiff's claims of likelihood of confusion. Each is discussed below.

A. *The O'Neill Survey*

█ The O'Neill Survey asked 188 individuals in New York and Texas to offer their impressions of six cans of condensed milk, including a Vinamilk can and a Longevity can. After selecting a group of consumers of condensed milk, the surveyors instructed the consumers to examine the products and asked if the consumers thought some or all of the six products were made by the same or different companies. O'Neill Survey at 7. Forty percent of the consumers thought some of the products were made by the same or related companies. *Id.* at 8. Of these, 59% selected Longevity and Vinamilk as being made by the same company. *Id.* Thus, out of the total number of respondents, 24% grouped the two labels together. *Id.*

Vinamilk moves to exclude the survey because of flaws in its methodology that "undermin[e] its reliability." Memorandum of Defendants/Counterclaim Plaintiffs In Support of Their Motion to Strike the Reports and Preclude the Testimony of Elizabeth Brotherton and Harry O'Neill, dated February 15, 2002 ("Defs.Mem."), at

11. Specifically, Vinamilk complains that: (1) O'Neill polled condensed milk consumers when he should have only polled sweetened condensed milk consumers; (2) the surveyors were permitted to translate the survey questions on their own without standardized translations for the 31% of consumers who were interviewed in a language other than English (either "Chinese" or Vietnamese); (3) one of the cans had English writing on one side and a combination of English, Vietnamese and Chinese writing on the other but the survey did not regulate which side was presented to the consumer; and (4) there was a "very significant disparity" between the responses in New York and those in Texas, though Vinamilk does not cite to any admissible evidence of what this disparity was. Defs. Mem. at 11–18.

Survey evidence is often offered by plaintiffs in trademark cases to show likelihood of confusion. *See, e.g., Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741–42 (2d Cir.1994) (polling consumers for their then-existing perceptions to establish actual confusion); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir.1987) (same). Where, as here, the challenged survey asks consumers "about their presently-existing states of mind to establish facts about the group's mental impressions," such state-of-mind evidence is properly admitted as an exception to the hearsay rule under Fed.R.Evid. 803(3). *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 227–28 (2d Cir.1999). The Second Circuit in *Schering* made clear that such a survey's "errors in methodology ... properly go only to the *weight* of the evidence"—not to its admissibility. *Id.* at 228 (emphasis added); *accord Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986). Thus, the hearsay rule does not bar the admission of the O'Neill Survey.

■ The only other potential limitation on the survey's admissibility is Fed. R.Evid. 403's provision that a court may exclude otherwise relevant evidence on the ground that the probative value of the evidence is substantially outweighed by the danger of such matters as unfair prejudice or jury confusion. *See Schering,* 189 F.3d at 228; *accord Coach, Inc. v. We Care Trading Co., Inc.,* 2001 WL 812126, at *6 (S.D.N.Y. July 18, 2001). Thus, a survey should be excluded where it is so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect. *See Schering,* 189 F.3d at 228; *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir.1999); *Arche, Inc. v. Azaleia, U.S.A., Inc.,* 882 F.Supp. 334, 336 (S.D.N.Y.1995). In order to determine a survey's "probative" value under Rule 403, however, it would seem that at least some attention must still be paid to the methodology of the survey because a court determines whether a survey is probative under Rule 403 by examining whether it was "fairly prepared and its results directed to the relevant issues." *Sterling Drug,* 14 F.3d at 741 (quoting *Universal City Studios v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984)).

Thus, in considering the probative value of a survey, it is tempting to look to longstanding case law that provides a detailed framework for evaluating a survey's trustworthiness. *See, e.g., Simon Property Group L.P. v. mySimon, Inc.,* 104 F.Supp.2d 1033, 1039–40 (S.D.Ind.2000) (under a Rule 403 analysis, a court must conduct a detailed examination of the trustworthiness of survey evidence).[1] An in-depth analysis of trustworthiness, however, is contrary to the admonition in *Schering* that "metholog[ical]" errors in a survey based on the present sense impressions of the respondents bear exclusively on the weight to be given the survey rather than bearing on an admissibility determination under Fed.R.Evid. 403. It is perhaps for this reason that where Rule 403 alone is at issue, courts have typically not performed an extensive analysis of the survey. *See, e.g., Cache, Inc. v. M.Z. Berger & Co.,* 2001 WL 38283, at *10–*11 (S.D.N.Y. Jan.16, 2001); *Bacardi & Co. Ltd. v. New York Lighter Co., Inc.,* 2000 WL 298915, at *5–*6 (E.D.N.Y. Mar.15, 2000). Instead courts have focused on whether the survey is so far out of the realm of relevance that a jury should not even be permitted to consider it. Thus in *Cache,* the court admitted a survey because, despite its "flaws," it did not "appear to be devoid of all probative value on the issue of the likelihood of confusion." 2001 WL 38283, at *11 (citing cases). Obviously, with the application of this relaxed standard, many surveys that might be accorded little weight after an analysis of their methodology would still pass muster under Rule 403. Indeed, the Seventh Cir-

1. In the commonly-cited case of *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189 (E.D.N.Y.1983), for example, the Court gauged the "trustworthiness" of a survey by examining whether the following criteria were present:

(1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

*Id.* at 1205. The *Toys R Us* criteria are typically used by courts to analyze the weight to be accorded a survey, not its admissibility under Rule 403. *See, e.g., National Distillers Products Co., LLC v. Refreshment Brands, Inc.,* 198 F.Supp.2d 474, 483 (S.D.N.Y.2002); *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272, 1276 (S.D.N.Y.1990).

cuit has noted that "[w]hile there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993) (internal citation omitted).

In the present case, the flaws proffered by Vinamilk are not so obvious and egregious that the Court can conclude that the probative value of the survey (even if it could be characterized as minimal) is outweighed by its prejudicial effect. Vinamilk's argument that consumers of sweetened condensed milk are necessarily a group that differs in its responses from consumers of condensed milk is unsupported by any evidence. In fact, the Vinamilk can does not even indicate that it is "sweetened" but states only that it is a "condensed dairy product." In any case, even a survey with an "overbroad" universe may still have probative value. *See Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 1997 WL 543086, at *5–*6 (S.D.N.Y. Sept.4, 1997). Second, while it may be true that no standard Vietnamese or "Chinese" translations were given to the questioners, the questions were fairly simple and thus easily translated, and in any event, only 31% of the interviews were conducted in Vietnamese or Chinese. Third, it is not of great moment that one of the cans contained different writing on each side because consumers were instructed to pick up and examine cans, ensuring that the products would be viewed in a manner similar to how they would be viewed in the marketplace. Fourth, the differences in results between the two locations does not, in itself, invalidate the survey.

While these aspects of the survey may undermine its probative value, this is certainly not a case where, for example, the survey is "little more than a memory test ... [that gives] no indication of whether there was a likelihood of confusion in the marketplace." *Starter Corp.*, 170 F.3d at 297; *see also Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 308 (S.D.N.Y.2001) (excluding survey under Fed.R.Evid. 403 where the products were "never actually used ... to test for confusion" but were instead used to determine if the interviewees "were familiar with a line of clothing" and where, *inter alia*, the questions had "little or no relevance to issues in the case"). The Court is confident that a jury will easily understand Vinamilk's arguments as to why the O'Neill Survey is flawed. It would not be unduly prejudicial under Fed. R.Evid. 403 to give the trier of fact an opportunity to evaluate the weight that should be accorded the survey.

In sum, the Court concludes that—even accepting *arguendo* Vinamilk's view that the survey is entitled to little weight—the probative value of the survey would not be substantially outweighed by any prejudicial effect or potential for jury confusion.

#### B. *The Brotherton Report*

■ The Brotherton Report details (1) the meaning of the Chinese ideograms that appear on the Longevity and Vinamilk labels and (2) the depiction of the figure on each of the labels, characterized by Brotherton as the "God of Longevity." Brotherton says the ideograms on the Longevity Brand mean "God of Longevity Condensed Milk." Brotherton Report at 1. She says the ideograms on one of the Vinamilk cans mean "God of Happiness, God of Wealth and God of Long Life Condensed Milk." *Id.* at 2. On another can, the ideograms mean "Immortality Master Condensed Milk." *Id.* Brotherton also describes in detail various traditional depictions of the God of Longevity. *Id.* at 1–3. She concludes that all the cans depict the God of Longevity. *Id.* at 2.

Vinamilk states that it seeks exclusion of the Brotherton Report and related testimony under Fed.R.Evid. 702. That rule provides that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. Vinamilk, however, does not challenge Brotherton's qualifications or the methods used by Brotherton for explaining the ideograms or the figures. Instead, it makes a number of specific objections to the Brotherton Report and testimony that bear on the relevance of her opinions under Fed. R.Evid. 401.

First, Vinamilk argues that Brotherton's translation of the ideograms is applicable to only a small subset of the consumers of the products: those who can read only Chinese. Defs. Mem. at 6, 9. Vinamilk makes this claim because Brotherton's expert opinions are limited to the meaning of the Chinese ideograms and the drawings in Chinese culture and do not address the meaning of these ideograms in, for example, Vietnamese culture. While the Court accepts Vinamilk's contention that the target consumer in the United States is both the "Chinese and Vietnamese consumers," they have not demonstrated that someone who reads Chinese but who is familiar with other languages would not have an understanding of these ideograms similar to the meaning explained by Brotherton. Even assuming that her opinions are only relevant to people who read only Chinese and not English or Vietnamese, which seems unlikely, this group is still a part of the target audience.

Next, Vinamilk contends that Brotherton's "individual opinions themselves are . . . irrelevant." Defs. Mem. at 9. Vinamilk contests the admissibility of Brotherton's statement that two of the Chinese ideograms on the Vinamilk and Longevity labels can be translated the same way even though they have different literal meanings. Id. at 9–10. They argue this statement is irrelevant because "there is no commonly accepted doctrine that requires or permits such a comparison under the trademark laws." Id. at 10. Vinamilk also argues that Brotherton's opinion that the images of the old men on the parties' labels are all the God of Longevity "is irrelevant to the jury's determination whether there is a likelihood of confusion between the Longevity Brand and [Vinamilk] Labels." Id. Both these contentions, however, set the bar far too high for what constitutes relevant evidence. The similarities Brotherton describes have relevance to the likelihood of confusion because they demonstrate that the cans have at least some common elements. While such evidence is obviously not dispositive, the evidence meets the threshold test of making the existence of likelihood of confusion "more probable . . . than it would be without the evidence." Fed.R.Evid. 401. In addition, Brotherton's Report will assuredly "assist the trier of fact to understand" the issue of what the ideographs and the drawing of the old man may mean. Fed.R.Evid. 702.

III. CONCLUSION

Defendants' motion to exclude the admission of the O'Neill Survey, the Brotherton Report and related testimony is denied.

SO ORDERED.